# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### Orlando Division

| | |
|---|---|
| VICTOR RODRIGUEZ, | * |
| IOAN BLAJ, | * |
| SIXTO DE LOS SANTOS, | * |
| LUIS F. DUARTE, | * |
| EROL HAFIZBEGOVIC, | * |
| ANGEL CRESPO, | * |
| JOSE L. RODRIGUEZ, | * |
| GREGLY WILSON, | * |
| HECTOR MEDINO, | * |
| ALFREDO RODRIGUEZ, | * |
| JOSE ESPARRA, JR., | * |
| LARRY GROVES, | * |
| FRITZ GEDEON, | * |
| FAIDRICK JOUBERT, | * |
| GLENWARD WILLIAMS, | * |
| CARLOS ALMONTE, | * |
| EMILIO HERNANDEZ, | * |
| LUIS ORREGO, | * |
| HANCE FELIX, | * |
| WALTER HERNANDEZ ANDRADE, | * |
| JEAN-SIMON LAGUERRE, | * |
| JOSE LOPEZ, | * |
| HECTOR FLORES, | * |
| EDDIE DIAZ, | * |
| JOSE HERNANDEZ ANDRADE, | * |
| INGRID MEINHOLD, | * |
| EFRAIN OVIEDO, | * |
| MARTHA HERNANDEZ, | * |
| ARTURO HERNANDEZ, | * |
| MARIO MARTINEZ, | * |
| YAIMELIT ZERPA, | * |
| MARILYN ORTIZ, | * |

CASE NO. 6:17-CV-1113-ORL-37-DCI

FABIO FRANCO,                                          *
STANLEY FENELON,                                       *
DOMINGO GOMEZ,                                         *
ABIDALLY AZEEZ,                                        *
MARQUITOS GARCIA,                                      *
SIMON SUMERLIN,                                        *
                                                       *
For themselves and similarly situated individuals,    *
                                                       *
                    **Plaintiffs,**                    *
v.                                                     *
                                                       *
MEARS DESTINATION SERVICES, INC.,                      *
d/b/a   Mears Transportation Group, and                *
                                                       *
PAUL S. MEARS, JR.,                                    *
JAMES L. MEARS,                                        *
JONATHAN P. MEARS,                                     *
PAUL S. MEARS, III,                                    *
JAMES B. MEARS,                                        *
CHARLES E. CARNS, JR.,                                 *
                                                       *
Individually and as executives for Mears              *
Destination Services, Inc.,                            *
                                                       *
                    **Defendants.**   *
                                                       *

## COLLECTIVE AND CLASS ACTION COMPLAINT FOR DECLARATORY JUDGMENT, MONETARY DAMAGES, INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL

The above-captioned Plaintiffs, on behalf of themselves ("Plaintiffs") and on behalf

of various classes of similarly situated individuals, and by and through their undersigned

counsel, hereby file this Complaint against their current or former employer Defendants

Mears Destination Services, Inc. d/b/a Mears Transportation Group ("MTG"), Paul S. Mears,

Jr., James L. Mears, Jonathan P. Mears, Paul S. Mears, III, James B. Mears, Charles E.

Cams, Jr. (collectively "Defendants" or "Mears") to recover:

- unpaid wages (including minimum wages and/or overtime compensation), liquated damages, interest, and reasonable attorneys' fees and costs under the Fair Labor Standards Act (FLSA) of 1938, 29 U.S.C. § 216(b);

- compensatory and punitive damages, interest, and reasonable attorneys' fees and costs for fraudulent inducement;

- compensatory and punitive damages, interest, and attorneys' fees and costs for unjust enrichment;

- compensatory and punitive damages, interest, and attorneys' fees and costs for quantum meruit; and

- declaratory and injunctive relief.

In support thereof, Plaintiffs state as follows:

## I. NATURE OF LAWSUIT

1. This civil action seeks monetary damages and declaratory and injunctive relief for Defendants' illegal and willful scheme of misclassifying nonexempt, employee drivers as independent contractors. Since 1939, Mears has operated a transportation company in greater Orlando, Florida and surrounding counties. Mears initially provided taxicab services only.[1] In

---

[1] It has been reported that Mears initially engaged its taxicab drivers as employees when "[i]n 1976[,] one of [the founding] Mears' four sons, Paul Jr., [a Defendant in the above-captioned case,] made a business decision that changed the industry. He fired every taxi driver, then offered them positions as independent contractors...." http://www.orlandoweekly.com/orlando/cab-fight/Content?oid=2274256. In other words, Mears has had a long history of disregarding or altering the classification of its work force in the search for, and name of, profits.

1971, Mears expanded its transportation business significantly when the Walt Disney World Resort ("Disney") opened. At that time, Mears began providing motor coach and shuttle-van services for Disney and area resorts pursuant to negotiated contracts. Mears eventually offered limousine and luxury sedans service, which, in or around late 1990s and early 2000s, expanded to include Sport Utility Vehicles ("SUVs") and luxury vans. Mears's network of taxicabs, motor coaches, shuttle vans, limousines, and luxury vehicles is the engine that powers Mears's transportation business.

2.       While Mears uses employees to operate its fleet of motor coaches, limousines, and shuttle vans, Mears labels the drivers operating its luxury fleet of sedans, SUVs, and vans as "independent contractors" ("Luxury Chauffeurs"). Mears intentionally misclassifies these Luxury Chauffeurs as independent contractors in a scheme to avoid paying minimum and overtime wages, employment taxes, benefits, and certain ordinary business expenses. Mears earns hundreds of millions of dollars annually while most Luxury Chauffeurs struggle to earn a living, despite working 70 to 100 hours (or more) in a week. For these Luxury Chauffeurs, life working for Mears in the Disney heartland is anything but magical.

3.       Luxury Chauffeurs are Mears employees. Indeed, the word "chauffeur" is defined as "a person *employed* to drive a private automobile or limousine for the owner" of that vehicle.[2] Mears's Luxury Chauffeurs complete an employment application, undergo an employee background check, and participate in an employment interview. Mears requires Luxury Chauffeurs to attend extensive employee training. Mears then forces its Luxury Chauffeurs to wear employee uniforms, follow an employee handbook, and obey employee

---

[2] http://www.dictionary.com/browse/chauffeur (emphasis added).

policies and procedures. Mears assigns Luxury Chauffeurs an employee identification number and then gives them nametags and business cards with the Mears logo on them. Mears also gives them a company car to drive. And then, Mears pays its Luxury Chauffeurs an hourly rate—which is precisely how employee drivers are paid. Mears even gives vacation days to its misclassified drivers—just like employees.

4.      Luxury Chauffeurs provide their services alongside Mears's employee drivers, who perform virtually the same job in the same area for the same company. Indeed, Mears employees supervising and/or managing some employee drivers also supervise and manage the Luxury Chauffeurs. On some occasions, Mears managers have required the misclassified chauffeurs to provide support for employees in shuttle vans, and on other occasions, required shuttle vans to provide support for Luxury Chauffeurs.

5.      Mears gives the Luxury Chauffeurs access to the *Driver Zone* website, which allows Mears to communicate with the misclassified drivers and provide them with critical information and directions necessary to perform their jobs. The first page of *Driver Zone* prominently states: "[t]his website is for Mears Employees and Independent Contractors." Mears does not meaningfully distinguish between these two types of workers.

6.      When clients or resort venues have a problem with Luxury Chauffeurs, those individuals call Mears to report and address the problems. Mears employees then discipline the misclassified drivers, up to and including termination at will—just like employees. Simply put, there is no credible basis to contend that Luxury Chauffeurs are independent contractors rather than Mears employees.

7.     According to Mears's website, Paul Mears, Sr. founded the company based on his commitment "to professionalism, customer service, and integrity."[3] While Mears teaches its misclassified drivers professionalism and customer service through extensive training, Mears's own integrity is noticeably absent here. Because of Defendants' unconscionable and willful misclassification scheme, Plaintiffs now file suit to recover their damages and enjoin Mears from continuing its illegal and improper conduct.

## II.     THE PARTIES

8.     Plaintiff Victor Rodriguez is an adult resident of Florida who has worked and continues to work as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Victor Rodriguez was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

9.     Plaintiff Efrain Oviedo is an adult resident of Florida who has worked and continues to work as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Efrain Oviedo was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

10.     Plaintiff Marilyn Ortiz is an adult resident of Florida who has worked and continues to work as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Marilyn Ortiz was an employee as defined under 29 U.S.C. § 203(e)(1). She has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

---

[3] http://www.mearstransportation.com/our-company/management/.

11. Plaintiff Domingo Gomez is an adult resident of Florida who has worked and continues to work as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Domingo Gomez was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

12. Plaintiff Sixto De Los Santos is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Sixto De Los Santos was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

13. Plaintiff Erol Hafizbegovic is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Erol Hafizbegovic was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

14. Plaintiff Luis F. Duarte is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Luis F. Duarte was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

15. Plaintiff Fritz Gedeon is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Fritz Gedeon was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

16. Plaintiff Angel Crespo is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Angel Crespo was an employee as

defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

17.    Plaintiff Jose L. Rodriguez is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Jose L. Rodriguez was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

18.    Plaintiff Jose Esparra, Jr. is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Jose Esparra, Jr. was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

19.    Plaintiff Larry Groves is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Larry Groves was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

20.    Plaintiff Faidrick Joubert is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Faidrick Joubert was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

21.    Plaintiff Glenward Williams is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Glenward Williams was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

22. Plaintiff Hector Medino is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Hector Medino was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

23. Plaintiff Ioan Blaj is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Ioan Blaj was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

24. Plaintiff Jose Lopez is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Jose Lopez was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

25. Plaintiff Carlos Almonte is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Carlos Almonte was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

26. Plaintiff Emilio Hernandez is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Emilio Hernandez was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

27. Plaintiff Luis Orrego is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Luis Orrego was an employee as defined

under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

28.     Plaintiff Hance Felix is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Hance Felix was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

29.     Plaintiff Jean-Simon Laguerre is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Jean-Simon Laguerre was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

30.     Plaintiff Hector Flores is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Hector Flores was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

31.     Plaintiff Walter Hernandez Andrade is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Walter Hernandez Andrade was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

32.     Plaintiff Gregly Wilson is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Gregly Wilson was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

33. Plaintiff Eddie Diaz is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Eddie Diaz was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

34. Plaintiff Jose Hernandez Andrade is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Jose Hernandez Andrade was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

35. Plaintiff Ingrid Meinhold is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Ingrid Meinhold was an employee as defined under 29 U.S.C. § 203(e)(1). She has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

36. Plaintiff Martha Hernandez is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Martha Hernandez was an employee as defined under 29 U.S.C. § 203(e)(1). She has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

37. Plaintiff Arturo Hernandez is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Arturo Hernandez was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

38. Plaintiff Mario Martinez is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Mario Martinez was an

employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

39.     Plaintiff Yaimelit Zerpa is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Yaimelit Zerpa was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

40.     Plaintiff Fabio Franco is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Fabio Franco was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

41.     Plaintiff Abidally Azeez is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Abidally Azeez was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

42.     Plaintiff Stanley Fenelon is an adult resident of Florida who worked as a Luxury Chauffeur for Mears. At all relevant times, Plaintiff Stanley Fenelon was an employee as defined under 29 U.S.C. § 203(e)(1). He has signed a consent form to opt in to this collective action, a copy of which is attached as Exhibit A.

43.     Plaintiff Alfredo Rodriguez is an adult resident of Florida who worked as a Luxury Chauffeur for Mears.

44.     Plaintiff Marquitos Garcia is an adult resident of Florida who worked as a Luxury Chauffeur for Mears.

45.     Plaintiff Simon Sumerlin is an adult resident of Florida who worked as a Luxury Chauffeur for Mears.

46.     During the relevant time period, Plaintiffs and those similarly situated: performed nonexempt labor for Defendants; were subject to Defendants' common policy and/or practice of not paying the prevailing minimum wage or regular wage rate for all hours worked; worked in excess of forty (40) hours per workweek; were subject to Defendants' common policy and/or practice of not paying the overtime wage differential for all hours worked in excess of forty (40) hours per workweek; operated unmetered motor vehicles for Mears that weigh 10,000 pounds or less; and operated Luxury sedans and SUVs, which are not designed to carry more than eight (8) passengers, including the driver, for compensation.

47.     Upon information and belief, at all relevant times, Defendant Mears is a Florida corporation with a principal place of business located at 324 Gore Street, Orlando, FL 32806. Mears may be served with process by service upon its Registered Agent, Richard Swann, Swann Hadley Stump Dietrich & Spears, P.A., 200 East New England Avenue, Suite 300, Winter Park, Florida 32789.

48.     Defendant Mears provides transportation services through a fleet of taxicabs, motor coaches, shuttle vans, and luxury vehicles across the United States. Mears has a near monopoly on vehicle for-hire transportation business in the Greater Orlando area, servicing the Orlando International Airport, the Sanford International Airport, major theme parks, and area resorts. At all times relevant to this action, Mears is and has been an "employer" within the meaning of 29 U.S.C. § 203(d), and an "enterprise" within the meaning of 29 U.S.C. § 203(s) as it engaged in commerce, specifically including but not limited to, the routine

transport of interstate passengers and the operation of vehicles that were manufactured out-of-state and shipped interstate, with an annual revenue in excess of $500,000.00.

49.     Defendant Mears is an employer of Plaintiffs and all similarly situated individuals under the definition of employer contained in the FLSA, and Defendant Mears intentionally misclassified Plaintiffs and similarly situated individuals as independent contractors. Defendant Mears is neither a Merchant Acquiring Entity nor Third Party Settlement Organization as defined under the Internal Revenue Code.

50.     Upon information and belief, at all relevant times, members of the Mears family and other Defendants owned and continue to own all of the stock in the corporation, which gave which gave and gives them control over Mears's financial affairs, including, but not limited to, decisions about structuring compensation for Luxury Chauffeurs.

51.     Upon information and belief, at all relevant times, Defendant Paul S. Mears Jr. is a resident of Florida and Chairman of the Board of Directors for Mears. Paul S. Mears Jr. is an "employer" as defined in 29 U.S.C. § 203(d), as he has operational control over Mears and was directly and/or indirectly involved in Mears's intentional scheme to misclassify Plaintiffs and similarly situated individuals as independent contractors. Upon further information and belief, Paul S. Mears Jr. owns shares of stock in Mears, thereby giving him control over the company's financial affairs.

52.     Upon information and belief, at all relevant times, Defendant James L. Mears is a resident of Florida and a member of the Board of Directors for Mears. James L. Mears is an "employer" as defined in 29 U.S.C. § 203(d), as he has operational control over Mears and was directly and/or indirectly involved in Mears's intentional scheme to misclassify Plaintiffs

and similarly situated individuals as independent contractors. Upon further information and belief, James L. Mears owns shares of stock in Mears, thereby giving him control over the company's financial affairs.

53. Upon information and belief, at all relevant times, Defendant Jonathan P. Mears is a resident of Florida and a member of the Board of Directors for Mears. Jonathan P. Mears is an "employer" as defined in 29 U.S.C. § 203(d), as he has operational control over Mears and was directly and/or indirectly involved in Mears's intentional scheme to misclassify Plaintiffs and similarly situated individuals as independent contractors. Upon further information and belief, Jonathan P. Mears owns shares of stock in Mears, thereby giving him control over the company's financial affairs.

54. Upon information and belief, at all relevant times, Defendant Paul S. Mears, III is a resident of Florida and is President, and a member of the Board of Directors for Mears. Paul S. Mears, III is an "employer" as defined in 29 U.S.C. § 203(d), as he has operational control over Mears and was directly and/or indirectly involved in Mears's intentional scheme to misclassify Plaintiffs and similarly situated individuals as independent contractors. Upon further information and belief, Paul S. Mears, III owns shares of stock in Mears, thereby giving him control over the company's financial affairs.

55. Upon information and belief, at all relevant times, Defendant James B. Mears is a resident of Florida and Executive Vice President, Operations for Mears. James B. Mears is an "employer" as defined in 29 U.S.C. § 203(d), as he has operational control over Mears and was directly and/or indirectly involved in Mears's intentional scheme to misclassify Plaintiffs and similarly situated individuals as independent contractors. Upon further

information and belief, James B. Mears owns shares of stock in Mears, thereby giving him control over the company's financial affairs.

56.     Upon information and belief, at all relevant times, Defendant Charles E. Carns, Jr. is a resident of Florida and Chief Executive Officer for Mears. Charles E. Carns, Jr. is an "employer" as defined in 29 U.S.C. § 203(d), as he has operational control over Mears and was directly and/or indirectly involved in Mears's intentional scheme to misclassify Plaintiffs and similarly situated individuals as independent contractors.

57.     Upon information and belief, Defendants engage in the same type of business as their Luxury Chauffeurs. The Luxury Chauffeurs are integrated into the regular part of Defendants' business enterprise. Defendants supply the misclassified drivers with the instrumentalities, tools, and place of work. Moreover, Defendants control the details of each Luxury Chauffeur's work through Mears's reservation and dispatch system, Mears's supervising and managing employees, and extensive policies and procedures.

### III.     JURISDICTION AND VENUE

58.     The subject matter jurisdiction of this Court is invoked pursuant to FLSA, 29 U.S.C. § 216(b) and 28 U.S.C. §§ 1331, 1337, and 1367.

59.     Pursuant to Rule 1.02(c) of the Local Rules of the Middle District of Florida and 28 U.S.C. § 1391(b)(2)-(3), (c), (d), venue is appropriate in this district because Defendants reside and otherwise conduct business in this district, and a substantial part of the unlawful acts giving rise to the claims described herein occurred in this district.

60.     Plaintiffs' claims are properly consolidated as a single action because their claims involve the same Defendants, arise from the same nexus of facts and circumstances,

and involve nearly identical issues of fact and law.

## IV.    COMMON FACTUAL ALLEGATIONS

61.    Each interaction Mears has with its Luxury Chauffeurs firmly establishes an employment, rather than a contractor, relationship.

### A.    Sourcing Luxury Chauffeurs.

62.    Mears does not seek Luxury Chauffeurs who embody the true characteristics of an entrepreneur—an independent businessperson who is not only armed with the tools of the trade, but also ready, willing, and able to operate his or her own independent business. To the contrary, Mears seeks Luxury Chauffeur candidates who are team players, who will listen, who will follow directions, and who are susceptible to training—just like an employee.

63.    To that end, Mears typically sources its Luxury Chauffeurs by advertising on employment websites like Glassdoor.com. These websites attract individuals looking for a traditional employment relationship. Mears's only job requirement for Luxury Chauffeur applicants is that they "must be at least 21 years of age and hold a valid Florida driver's license."[4] Mears does not require any specialized skill or certification, or even professional driving experience.

64.    Most of the Luxury Chauffeur candidates have not owned a prior business. The candidates never intend to be independent contractors when seeking to drive/work for Mears. Rather, Mears informs the misclassified drivers that they must be "independent contractors." The driver candidates only want to earn a living, and Mears is willing to oblige.

---

[4] https://www.glassdoor.com/job-listing/luxury-vehicle-chauffeur-mears-transportation-group-JV_IC1154247_KO0,24_KE25,51.htm?jl=2437606982.

65.    Mears provides the Luxury Chauffeurs with the opportunity to start a career in transportation. On its website, Mears advertises "careers" for independent Luxury Chauffeurs side-by-side with employee positions, suggesting they are one and the same:

**Welcome to the Mears Career Gateway**



We are pleased that you are interested in working with us. We have created this career site with you in mind. Mears Transportation Group hires or contracts with qualified candidates for a number of positions including drivers, mechanics, cleaners, customer service, dispatchers, office staff, and field and line supervisors. No matter what type of career path you desire, we invite you to explore the current opportunities within our organization.

| Independent Taxi Drivers | Independent Luxury Chauffeurs | Employee Positions | Field Staff Positions |
| --- | --- | --- | --- |
|  |  |  |  |

http://www.mearstransportation.com/careers.html. Mears even advertises job opportunities for Luxury Chauffeurs on Careerbuilder.com.

66.    Webster's defines career as "a profession for which one trains and which is undertaken as a permanent calling."[5] By offering alleged contractor candidates a "career," Mears intends to train them and have them work on a permanent basis as a career employee. And this is precisely what happens.

67.    Before training begins, however, Luxury Chauffeur applicants must complete an employment application, undergo employment background and driving record checks, and participate in job interviews conducted by Mears employees. In this respect, Mears even

---

[5] https://www.merriam-webster.com/dictionary/career.

acknowledges that its relationship with the misclassified drivers is rooted in employment, stating that it "performs criminal background checks *prior to employment*."[6]

**B.      Training Luxury Chauffeurs.**

68.     Mears trains its Luxury Chauffeurs extensively. After their employment interview, the Luxury Chauffeur candidates must attend a three-day training program. Although the Luxury Chauffeur candidates have not signed any agreement at this point, Mears does not pay candidates for attending this mandatory training. Nor does Mears charge candidates for attending the three-day training course, other than charging a nominal fee of $25 to cover the cost of creating a substantial spiral-bound, Mears handbook that provides detailed instructions on critical aspects of the Luxury Chauffeur position.

69.     Mears designed its training program to teach Luxury Chauffeur candidates how to be a "Mears driver." Indeed, Mears believes many Luxury Chauffeur candidates are inexperienced drivers and the extensive training teaches them how to operate luxury vehicles. Among the training program topics, Mears teaches its Luxury Chauffeur candidates where they have to work and pick up fares, how to interact with customers, and what they must wear. Mears even provides the candidates with step-by-step instructions on how to perform their administrative responsibilities (like signing in, handling vouchers, and processing credit card charges).

70.     Mears also trains Luxury Chauffeur candidates during the initial training program on how to obtain and service their vehicles. Mears explains that the misclassified drivers start their employment as a daily driver, meaning that they have to pick-up and drop-

---

[6] http://www.mearstransportation.com/mears-means/ (emphasis added).

off their vehicle each day at specified times. This process allows Mears managers and supervisors to interact daily with new drivers, coaching them on job performance.

71.    Mears also trains Luxury Chauffeur candidates on the various available shifts. Mears even advertises that upon completion of the training program, all Luxury Chauffeurs:

> choose their vehicle shift from one of our eight vehicle shift options; 4 a.m.-4 p.m., 6 a.m.-6 p.m., 9 a.m.-9 p.m., 11 a.m.-11 p.m., 4 p.m.-4 a.m., 6 p.m.-6 a.m., 9 p.m.-9a.m., or 11 p.m.-11 a.m. The prices vary for each twelve-hour period. *New chauffeurs are offered a reduced rate for their first 5 weeks.*[7]

Upon information and belief, Mears offers reduced rates to eliminate the start-up costs associated with the misclassification scheme because driver candidates cannot afford them.

72.    During the training course, Mears quizzes the misclassified driver candidates on their knowledge of the subject matters to ensure adequate training has occurred. Upon information and belief, these quizzes are the same types of quizzes provided to employee drivers in motor coaches, shuttle vans, and even limousines.[8]

73.    During the three-day training program, Mears also teaches candidates about Mears's "Core Values," embedding in the minds of the misclassified drivers how they must act and perform on a daily basis. In fact, Mears recognizes its drivers who demonstrate Core Values, including its Luxury Chauffeurs, in its monthly employee newsletter, called *Mears in Motion*. In this publication, Mears identifies Luxury Chauffeurs as "Examples of Excellence"

---

[7] https://www.glassdoor.com/job-listing/luxury-vehicle-chauffeur-mears-transportation-group-JV_IC1154247_KO0,24_KE25,51.htm?jl=2437606982 (emphasis added).

[8] Mears classifies Limousine Chauffeurs as employees, while classifying other Luxury Chauffeurs as independent contractors. There is no meaningful difference between these types of drivers

under the "Employee News" section, like for example:



74.     Upon information and belief, Mears requires its employee drivers to complete

the same type of initial training that it requires Luxury Chauffeurs to complete. Mears even

conducts the three-day training class in the same training facility—at its main headquarters—

that employee drivers attend. And the same full-time Mears staff that teaches employee

driver classes teaches the Luxury Chauffeur classes.

75.    Mears calls its initial training program "familiarization" in an obvious attempt to cloud the true nature of the program—given any training (let alone Mears's extensive training) offends the notion of an independent contractor classification. As evidence of this transparent tactic, Mears publicly admits its Luxury Chauffeurs are "highly trained, offering consistent and timely service" rather than being merely "familiar" with its operations.[9] In fact, Mears stresses that its "job is to screen *and train every driver* . . . ."[10] And Mears further states that its:

> dedication to training is rooted in the Mears vision for how a transportation company should operate. With the goal of exceeding our customers' expectations, *our full-time training staff guides* taxi drivers, *luxury vehicle chauffeurs,* bus operators and all other workforce *in customized skills programs. Training is conducted both in the classroom and on the road.* Topics include offering exemplary service, standard etiquette at resorts, professional attire and grooming, *operational policies* and area knowledge training. Also required is our defensive driver program, which focuses on safe driving habits.[11]

76.    Even after executing a contract, Mears requires its Luxury Chauffeurs to continue their training at various times during the year. Under the heading "Mears Quality You Can Count On," Mears acknowledges that its "luxury sedan chauffeurs undergo ongoing training . . . ."[12] In fact, Luxury Chauffeurs are placed on the "Special Account Team" after they participate in certain, additional training sessions. And misclassified drivers, including some of the Plaintiffs, are recognized as a "Dream Teamer" if the driver completes specific

---

[9] http://www.mearstransportation.com/mears-means/.

[10] http://www.mearstransportation.com/fleet/luxury-sedans/ (emphasis added).

[11] http://www.mearstransportation.com/mears-means/ (emphasis added).

[12] http://www.mearstransportation.com/fleet/luxury-sedans/.

additional training. Mears also requires their Luxury Chauffeurs to take refresher training courses from time to time.

77.    While Luxury Chauffeurs may teach some of this supplemental training, Mears must approve the content of the training material, and the training is still conducted at Mears's facility under its watchful eye. In other words, Defendants direct and control all training. And Luxury Chauffeurs are not compensated for any supplemental training classes either. Nor do the misclassified drivers pay Mears for this training, despite them recognizing the benefits of this training.

78.    For example, in the June 2015 edition of *Mears in Motion* Newsletter, after receiving praise from a client for the quality of his service, a Luxury Chauffeur thanked Luxury Vehicle Training Manager, David Thomas, stating that "*the things I do are so many of the basic things* that I hear Dave Thomas *mention in his class week after week after week*. Kudos to my friend, Mr. Thomas and the great job he does week after week. *He truly pushes to bring out the best in all of us. He did in me!*"[13]

79.    Mears's mandatory initial and continual training distinguishes misclassified Luxury Chauffeurs from true independent contractor drivers who undertake engagements ready and able to perform the contracted-for services. The extensive training establishes an employer-employee relationship for this reason alone.

80.    After completing an employment application, an employee background check, an employee interview, and employee training, Luxury Chauffeurs receive an employee

---

[13] http://www.mearstransportation.com/wp-content/uploads/2015/05/MIM-May-June-2015.pdf (emphasis added).

identification number, nametags, and business cards with the Mears logo on them:



Once trained and outfitted as a Mears's driver, Luxury Chauffeurs are now ready to contract with the company.

## C.     The Secret Independent Contractor Agreement.

81.     Luxury Chauffeurs must sign an agreement, purportedly establishing an independent contractor relationship between Mears and the misclassified drivers. Mears creates the independent contractor agreement, which is a take-it-or-leave-it contract of adhesion. No negotiation is possible. Luxury Chauffeurs must sign the contract in their individual capacity; drivers cannot be incorporated.

82.     For all intents and purposes, Defendants' independent contractor agreement is a secret. Not one of the Plaintiffs has a copy of their contractor agreement. In fact, Mears does not allow any Luxury Chauffeur to have a copy of his or her contract or allow them to remove it from the building. Even when disputes arise and a misclassified driver engages an attorney, Mears guards its contracts to such a degree that it refuses to produce the agreement

24

"without a valid Subpoena":



83. Luxury Chauffeurs have no meaningful opportunity to consult with a lawyer before or after entering into the contract or to even refer back to the agreement during their work with Defendants. Instead, Mears treats the secret contract like confidential employment records to which misclassified drivers have no right of access. As a result, Luxury Chauffeurs rely almost exclusively on Mears for the drivers' understanding of their contract "rights."[14] In other words, the misclassified drivers are told how they must perform their jobs on a daily basis and the drivers have no documentation to dispute Mears's instructions or directions.

84. Luxury Chauffeurs must sign the secret contract although many of them do not understand the legality of being an independent contractor or the material contract terms. This lack of understanding is particularly true for the significant portion off all misclassified

---

[14] Similarly, Luxury Chauffeurs never participated in or received copies of Defendants' alleged contract with area resorts and theme parks to provide transportation services. Instead, Luxury Chauffeurs rely almost exclusively on direction and control by Mears in servicing Mears's clients.

drivers for whom English is a second language. These Luxury Chauffeurs typically have a high-school level education only.

85.     Defendants make no material effort to explain any of the provisions of the contract or otherwise ensure the terms are understood. To the contrary, Luxury Chauffeurs have no real time to consider the terms of the agreement or, in many instances, even read it completely. A Mears manager watches the misclassified drivers, adding pressure for drivers to sign the agreement immediately or risk losing the necessary work.

86.     Pursuant to the secret contract, Luxury Chauffeurs, like employees, begin with a probationary period during which Mears reviews their work daily. Upon information and belief, Defendants can cancel the secret agreement at any time, effectively terminating the misclassified drivers at will—like an employee—under the contract. [15]

87.     Upon information and belief, the secret independent contractor agreement has a purported 12-month term with unlimited automatic term renewals. The lack of a limited term allows Luxury Chauffeurs to have an indefinite relationship with Mears, like career employees. As a result, Luxury Chauffeurs work with Mears for many years—in some cases, a decade or more.

88.     Like employees, Luxury Chauffeurs drive exclusively for Mears. Driving for a competitor or any other company "would get your contract ripped"—a phrase used by drivers to express Mears's constant threat of termination at will. Mears prohibits Luxury Chauffeurs not only from driving elsewhere, but also from hiring their own employees to service their

---

[15] For example, one Luxury Chauffeur was terminated as a result of having two red-light camera violations, notwithstanding that the misclassified driver did not believe he had been told about a "two reds and out" policy.

contract.

89.     Under the secret contract, Luxury Chauffeurs must pay Mears rates that Mears will unilaterally determine (or change) at its discretion. Upon information and belief, Mears does not include the rates—a material contract term—in the secret contract. Mears charges the misclassified drivers upwards of $1,250 per week, depending on the season, for using Mears's vehicles and driving Mears's clients (notwithstanding Mears's employee drivers provide the same types of service without paying Mears to operate its fleet). On many occasions, Luxury Chauffeurs owe and pay Mears at the end of a day or week because the demand for transportation service is low and Mears controls who receives fares under its restrictive policies, practices, and procedures. The misclassified drivers cannot earn enough money to pay the daily or weekly charges despite working 70 to 100 hours (or more) in a week.

90.     Upon information and belief, under its so-called contractor agreement, Mears tries to cast itself as a transportation "services" company. Mears disingenuously contends that it provides Luxury Chauffeurs with services that allow them to develop their "own clients" through Mears's reservation center (notwithstanding Mears's repeated contention elsewhere that any clients are Mears's clients rather than clients of the drivers). Mears cannot legitimately contend that it merely provides "transportation services," connecting prospective clients with independent drivers through a call center or a mobile app. To the contrary, Mears represents itself as, and in fact is, a transportation company—one that has operated with its own employee drivers and vehicles for almost eighty years. Any effort to create a different story (under the guise of a written "contractor" agreement) is proven false with even a

minimal scrutiny of the facts.

**D.     Mears Provides Luxury Chauffeurs with the Tools of Their Trade.**

91.     Mears's Luxury Chauffeurs make no material capital investment in their independent contractor business. Besides relatively inexpensive accessories that Mears requires Luxury Chauffeurs to purchase—like an umbrella, hand sanitizer, water, phone charger, a car seat, a nametag, and a uniform[16]—the misclassified drivers pay only a one-day rental fee to Mears to begin operating as a daily driver. Mears would like the Luxury Chauffeurs to pay their vehicle lease in advance but, upon information and belief, advance payment is not required under the contract. Moreover, upon information and belief, Mears requires all payments to be made in cash as part of a scheme to avoid certain tax obligations.

92.     While a true independent contractor is armed with the tools of his or her trade when commencing an engagement, Mears provides its Luxury Chauffeurs with the essential tools to operate their so-called independent business. These costs incident to service include:

a.     **Permits and Access**. Mears provides at no costs to its Luxury Chauffeurs vehicle permits for the City of Orlando, the Greater Orlando Airport Authority ("GOAA"), Disney, Osceola County, and Port Canaveral. Mears also arranges, at no cost to the misclassified drivers, for preferred parking at airports, resorts, and theme Parks—the cost of parking, in particular, is significant.

b.     **Equipment**. Mears provides the Luxury Chauffeurs, at no cost, the following: credit card machine, MDT communication equipment, GPS tracking

---

[16] The uniform consists of a black jacket, gray pants, white shirt, and burgundy tie. The uniform can be purchased from Mears or anywhere else— but, if purchased elsewhere, it must match Mears's requirements perfectly.

systems with navigation, greeting boards, and an E-Pass transponder.

  c.  **Vehicle and Insurance**. Mears provides vehicles to Luxury Chauffeurs on a daily, weekly, or team basis. While Luxury Chauffeurs may choose between white and black vehicles on occasion, the misclassified drivers have no other material choice with respect to the provided vehicle. Luxury Chauffeurs do not finance the vehicle and there is no credit extended as part of access to the vehicle. The misclassified drivers retain no right to purchase, or other interest in, any vehicle whatsoever despite paying significant lease fees (in some cases, for many years).[17] Mears also insures the vehicle and the passengers at no cost to the misclassified driver. In fact, Luxury Chauffeurs are not required to carry any insurance at all.

  d.  **Fuel**. Mears advances the cost of fuel to Luxury Chauffeurs, which is their most significant "business expense." Mears provides a vehicle with a full tank of gas; Luxury Chauffeurs must return the vehicle with a full tank, paid for from their earnings, at the end of their daily or weekly shift. Drivers purchase fuel directly from Mears but do not need to pay for the fuel until their respective shift ends.[18] This fuel is available and advanced to the misclassified drivers whenever they need it from Mears's on-site gas station. The fuel costs are charged to, and deducted from, Luxury Chauffeurs' company accounts during settlement. In addition to fuel, Mears advances the cost of tolls, which are charged on the Company provided E-Pass transponder but ultimately paid by the Luxury Chauffeur as part of the settlement process.

---

[17] Upon information and belief, Mears possesses no license to rent vehicles commercially.

[18] Upon information and belief, Mears possesses no license to sell gas commercially.

e.    **Maintenance.** Defendants pay the entire cost of servicing the vehicles, and even provide 24-hour roadside assistance. Every three- to five-thousand miles, each Mears-owned sedan undergoes regular maintenance regardless of whether the Luxury Chauffeur needed the vehicle on the maintenance day. The drivers have no say or input into the timing of the maintenance. When maintenance is scheduled, Luxury Chauffeurs cannot drive, and must, instead, return to headquarters and wait for the vehicle to be serviced. "And vehicle exteriors are maintained for superior detailing every quarter, and a thorough washing and vacuuming prior to each shift."[19] Luxury Chauffeurs have no control over this Mears policy either. If the drivers do not complete these services timely, they cannot drive or might get their contract ripped.

f.    **Administrative Support.** Mears employees handle virtually every material administrative function necessary for the Luxury Chauffeurs to operate their alleged independent businesses. Mears provides dispatchers to move vehicles into place for their clients. Mears provides employees who handle client relations issues and disputes (whether they involve hotel, airport, theme parks, or trip customers). Mears employs a significant workforce at the airport to manage clients who have already made reservations or to solicit clients who want luxury transportation services. Mears employees at the airport tell Luxury Chauffeurs what they should do with respect to a client. And Mears employees reconcile the misclassified drivers' daily or weekly settlement payments.

---

[19] http://www.mearstransportation.com/fleet/luxury-sedans/.

g.    **Customers/Clients**. Mears provides Luxury Chauffeurs with the vast majority of their clients. Mears advertises the misclassified drivers' services as its own services. Mears created a mobile app that allows customers to schedule appointments directly with Mears. Indeed, Defendants acknowledge that Mears has developed a significant demand for its luxury vehicle services by marketing and providing those services to clients. Mears works with resorts and theme parks to provide transportation services for guests. Mears then uses its extensive policies and procedures to deny Luxury Chauffeurs any meaningful choice other than servicing Defendants' clients. In other words, Luxury Chauffeurs invest little into advertising to develop a client base.

93.    As the above allegations demonstrate, Luxury Chauffeurs make no material investment in their business and/or material business costs are greatly subsidized or deferred until after such time the drivers earn money from Mears to pay Mears for the business costs Mears advanced the drivers for driving Mears's clients. For this reason alone, Defendants cannot legitimately classify its Luxury Chauffeurs as independent contractors.

**E.    Mears Controls Compensation.**

94.    Defendants control Luxury Chauffeurs' compensation. First, Mears changes the amount of Luxury Chauffeurs' lease payment depending whether it is high, middle, or low season; whether a car is black or white; and whether the vehicle is a Town Car or an SUV. Mears sets fares that the misclassified drivers can charge. And Mears determines the type of rate charged for the fare.

95.     Mears pays Luxury Chauffeurs in three ways and for each, Mears unilaterally determines the amount of the rate. First, Luxury Chauffeurs are paid based on a flat-rate amount. Second, the misclassified drivers can receive a per mile rate. Third, Mears pays the Luxury Chauffeur an hourly rate, like an employee, for chartered "runs."[20] Mears determines when a "run" (i.e., a fare for a client) will be an hourly rate, mileage rate, or flat rate. The misclassified drivers cannot negotiate any of these rates.

96.     Mears can change the rates whenever it wants to change the rates. Mears even offers discounted rides on its own website, and on third-party sites like Groupon.com, without any input from the misclassified drivers:



97.     Mears has "exclusive" agreements to service the local airports, resorts, and theme parks. Mears does not involve the contractors in the negotiation process and the drivers cannot change negotiated rates even if clients would agree. Mears provides Luxury

---

[20] Mears defines a charter "run" as a company-generated fare that is a minimum of three hours for the trip. If the Charter is out of town, the run turns from an hourly rate into a mileage rate if the mileage rate exceeds the hourly amount.

Chauffeurs with a rate sheet that shows flat-rate fares (e.g., the rate charged from the Disney Swan and Dolphin Resort to Port Canaveral or from the Ritz Carlton to a specific restaurant). If a misclassified driver alters set rates, that driver will get his contract ripped.

98.     Mears does not pay Luxury Chauffeurs on those many occasions where a client does not show for a scheduled appointment (a "no-show") notwithstanding the fact that Mears charges the customer in advance and retains the payment even if the client is a no-show under most circumstances.[21] And if Mears's clients demand a refund because of a service dispute, Mears, not the driver, decides whether a refund will be issued. Mears will not pay the chauffeur if Mears decides to refund the fare. The driver has no say in the decision-making process related to profits and losses in his or her so-called independent business.

99.     If clients ask whether any fare includes a tip, Mears requires the misclassified drivers to answer affirmatively rather than provide them the chance for more compensation through a tip. Defendants admit that every fare includes a 20% gratuity but Mears does not pay this gratuity to the misclassified drivers.[22]

100.    Similarly, Mears will not pay the misclassified drivers for any "To Be Billed" ("TBB") runs—where Mears is billed in advance or paid through its reservation systems— unless the Luxury Chauffeur provides executed documents from the clients. In other words, although Mears already received authorization and payment from the clients, Mears requires misclassified drivers to obtain signatures (which can be difficult in some circumstances) as a potential hurdle from drivers obtaining earned fares.

---

[21] Mears's policy is to pay drivers for no-shows for *Hello!* Florida engagements only.

[22] *See* http://www.mearstransportation.com/faq/.

101. Moreover, Luxury Chauffeurs cannot receive an assignment or "copy" fare unless they log onto the MDT system. A "copy" is a fare generated and processed by Mears and disseminated to Luxury Chauffeurs as Mears determines. Mears uses the same "copy" term with respect to employee drivers. The percentage of Mears-generated assignments or copies significantly outweighs those trips generated by the Luxury Chauffeurs themselves, which are extremely rare. Luxury Chauffeurs do have repeat clients—whom are prior Mears customers who request or call a driver usually because of good service—but these fares represent a very small range of 10% to 30% of Luxury Chauffeurs' overall fares.

102. Finally, Mears charges each Luxury Chauffeur a fee for any fare in which the driver uses Mears's reservations system or payment-processing equipment. Upon information and belief, the fee is not mentioned in Mears's independent contractor agreement. The fee ranges from 6% to 10% and is assessed pursuant to Mears's own policies. Mears charges drivers 10% of each fare if Mears generated the fare (received the service inquiry from the client) and collected the fare from the client. And Mears charges 6% for any fare generated by the misclassified drivers but paid using Mears's processing equipment. As part of their misclassification scheme, Mears fraudulently and/or erroneously reports the misclassified drivers' earnings on IRS Form 1099-K contrary to IRS guidance.[23]

103. Based on these common actions, Defendants actively control Luxury Chauffeurs' ability to earn profits and sustain losses. Because of this involvement in the misclassified drivers' business, there is no credible basis to find the drivers are independent

---

[23] https://www.irs.gov/uac/general-faqs-on-new-payment-card-reporting-requirements.

contractors for this reason alone.

**F.     Defendants' Control Over the Manner and the Means.**

104.    Any meaningful independence that Luxury Chauffeurs enjoy is purely illusory. Mears utilizes extensive policies and procedures—the same type of policies and procedures used for its employee drivers—to control its misclassified contractor drivers. The following facts represent indicia of control that Defendants exert over Luxury Chauffeurs undermining any finding that the misclassified drivers are truly independent:

a.     **Controlling Daily Appearance.** For years, Mears required Luxury Chauffeurs to be clean shaven. Defendants have policies against visible tattoos, certain hairstyles, and certain types of jewelry. And like a typical employee-employer relationship, Defendants require Luxury Chauffeurs to wear uniforms, which Mears claims is a way in which clients can associate the misclassified drivers as a Mears driver. Mears disciplines its Luxury Chauffeurs for removing their sports coats while waiting in their vehicles outside of Mears-contracted hotels—even during hot summer months. Because Drivers cannot afford to run their air conditioning given fuel costs, they must wait hours inside their vehicles in stifling conditions, wearing a sports coat per Mears's instructions, for a single customer trip that might total only $5.

b.     **Controlling Checkout/On and Check In/Off.** Mears has employees whose responsibilities include managing and supervising Luxury Chauffeurs on a daily basis. Drivers must report to managers and supervisors as part of the check-in and checkout procedures for returning and receiving a vehicle (whether on a daily or weekly basis). Drivers are required to sign onto the MDT system when they are

working. And the misclassified drivers must respond when the managers and/or supervisors contact them. If a Luxury Chauffeur is on the road, it is common for a manager and/or supervisor to send a text message that reads "10-7." This 10-7 code means drivers must return to headquarters immediately where they will usually receive some sort of discipline. Managers will have the drivers wait hours before talking to them about whatever behavior Mears wants to correct. Mears frequently issues 10-7 codes. For example, if a weekly driver is "on the curb" (i.e., waiting at a hotel) and not signed onto MDT, the misclassified driver may receive a 10-7 code.[24]

      c.    **Controlling Daily Performance**. Defendants control the misclassified drivers' daily work performance through uniform policies, practices, and procedures. This control involves virtually every aspect of the manner and means of the service that the misclassified drivers provide Mears's clients including, but not limited to:

      i.    <u>Trip travel routes</u>: Mears provides travel routes during mandatory initial training. Mears uses GPS coordinates and traffic information to inform drivers where to travel. Mears has a policy that limits the miles a driver may travel during any given day or week, restricting misclassified drivers to the most efficient routes (rather than scenic routes as a tourist client may request).

      ii.    <u>Driver speeds</u>: Mears's safety department operates speed traps to catch drivers traveling over the speed limit. Mears's practice and/or policy is to terminate drivers for speeding and red-light camera violations after a

---

[24] Muslim drivers were 10-7'd because they refused to transport dogs.

certain number citations as determined by Mears.[25]

     iii.        <u>Client interactions</u>: Mears provides training on how to engage clients and employs policies in its Luxury Chauffeur handbook detailing how drivers must engage clients. Mears managers enforce the company's policies, disciplining the misclassified drivers for policy violations.

     iv.        <u>Payment processing</u>: Mears has policies that drivers must follow for accepting and processing payments from clients.

     v.        <u>Cell phone use</u>: Mears has a policy that prohibits drivers from using cellular telephones with passengers except when Mears contacts them.

     vi.        <u>Wait times</u>: Mears has a policy requiring drivers to wait at least fifteen minutes after a set appointment before an individual can be considered a no-show, and even then, the driver needs express approval to leave.

     vii.        <u>Wait locations</u>: Mears has a policy instructing Luxury Chauffeurs where they must wait for clients at resorts and theme parks. Upon information and belief, Mears controls the locations of its drivers at resorts by disseminating erroneous information about the amount of resort checkouts through the Driver Zone work portal. On occasion, when Luxury Chauffeur presence is insufficient, Mears will use its hourly, employee shuttle-van drivers to work hotel locations side-by-side with the misclassified contractors

---

[25] One Luxury Chauffeur reported that, after seven years of a clean driving record with Mears, he had a minor "fender bender" in which there was no damage to either car. He did not call and report the accident to "safety." Someone must have seen the accident and called Mears, as the misclassified driver was 10-7'd (i.e., called into the Mears's office) and his contract was cancelled on the spot.

in the field. Mears employee shuttle-van drivers and Luxury Chauffeurs even use the same documents:



Employee shuttle drivers would use the above-pictured ticket for return trips, and Luxury Chauffeurs would use this same ticket when performing "shuttle runs" to cover employee shuttle vans.

  viii.  Client fares: Because Mears advertises its contact information; provides the mobile app clients download and use; and negotiates contracts with airports, resorts, and theme parks, most clients contact Mears for service. Mears then determines which Luxury Chauffeur transports the client. And as alleged previously, under Mears's policies, it sets the rate for each fare.

  ix.  Vehicle operation times: Mears requires its Luxury Chauffeurs to work certain shifts—even advertising these shifts on websites.[26] Additionally, the drivers must comply with specific maintenance procedures, impacting when they can be on the road.[27] Mears does not distinguish between its employee drivers and Luxury Chauffeurs, explaining that the "safety of our

---

[26] https://reserve.mearstransportation.com/service/careerjobs.aspx?id=2.

[27] In videos posted on its website, Mears acknowledges its "control [over] all maintenance procedures and fleet replacement decisions." *See* Video, "Mears - Maintenance" at 0:08-0:12 seconds, available at http://www.mearstransportation.com/mears-means/.

customers and employees" is important while showing a video of Luxury Chauffeurs.[28] Mears also has scheduled drop-off times on a daily and weekly basis, thereby further controlling when drivers can be on the road.

      x.      <u>Settlement</u>:     Luxury Chauffeurs are paid in a process called settlement. The settlement receipt provides each driver with an itemized accounting of his or her runs for the settlement period. Settlement receipts contain informational messages or specific instructions and directions to Luxury Chauffeurs that they must follow:

 

      d.      **Controlling Business Administration**. Mears has policies on when it will pay Luxury Chauffeurs for their weekly pay. Defendants pay Luxury Chauffeurs (in cash) (or the drivers must pay Defendants in cash) on set days at set times at the end of the drivers' day or week. During the settlement process, Mears collects the next vehicle lease payment. If there is no cash when a driver settles, the misclassified

---

[28] *See* Video, "Mears - Safety" at 0:11-1:13 seconds, available at http://www.mearstransportation.com/mears-means/.

drivers must return at another time to receive his or her settlement pay. Drivers are required to work with Mears's cashiers to reconcile the amount of charge backs for client refunds, fuel, and tolls. Mears also controls the type of equipment Luxury Chauffeurs may use to process payment from clients, prohibiting or threatening termination under the guise of a "policy" if Luxury Chauffeurs use Square.com (an online credit card processing application, which charges about 3% per credit card transaction). Mears would give drivers a strike if they were found using Square.com. Mears wants its drivers to use its own credit card processing application because Mears charges drivers 6% for processing payments for repeat customers and 10% for processing payments for copy or charter runs.

     e.    **Monitoring Drivers Daily.** Mears proudly states "[o]ur luxury vehicles . . . are all tracked by global positioning satellites with the luxury vehicles and taxicabs actually dispatched using GPS."[29] Mears concedes, in effect, that it controls precisely where it sends Luxury Chauffeurs on a daily basis—the same type of control Mears provides with respect to its employee drivers. It is not unusual for a Luxury Chauffeur to be asked "why were you at [wherever Mears did not think they were supposed to be]." Upon information and belief, Mears even uses a mystery shopper who monitors the misclassified drivers unbeknownst to the drivers, tracking their behaviors. For example, if a "shopper" spotted a driver on a curb who was not properly dressed, the driver would be 10-7'd (i.e., called into the office) and

---

[29] *See* Video, "Mears - Technology" at 0:00-0:14 seconds, available at
http://www.mearstransportation.com/mears-means/.

reprimanded.

f.    **Vacation.** Mears gives its drivers at least two weeks of vacation each year. Under vacation time, Luxury Chauffeurs can take off from work without the fear of termination. Luxury Chauffeurs are not charged for their vehicles on vacation days, but they must return the vehicle. Of course, the misclassified drivers must inform Mears before taking days off. And Mears tracks the number of vacation days for Luxury Chauffeurs in the same way an employer would for its employees.

g.    **Disciplining Drivers.** When resorts or clients have an issue with Luxury Chauffeur performance or behaviors, they call Mears. Mears, in turn, disciplines the misclassified drivers up to and including termination. Mears disciplines its misclassified drivers for a multitude of other reasons beyond resort or client complaints—principally, when they fail to comply with Mears's policies, practices, or procedures. Defendants use fares as a carrot and a stick. Mears will reward Luxury Chauffeurs who comply with policies and instructions, and then discipline Luxury Chauffeurs for their non-compliance by excluding them from fares or taking them off the road with a 10-7 call. This disciplinary process is designed to conform driver behaviors to the "Mears way" through what amounts to be de facto employee reviews in addition to employee discipline.

105.    Based on the above indicia of control, Luxury Chauffeurs do nothing more than drive customers when, where, and how Mears tells them. For this reason, Luxury Chauffeurs are not properly classified as independent contractors.

## V.    COLLECTIVE ACTION ALLEGATIONS

106.    Plaintiffs, individually and on behalf of the proposed classes as defined herein, incorporate by reference all of the above paragraphs as if fully set forth herein.

107.    All Plaintiffs identified hereunder as an employee pursuant to 29 U.S.C. § 203(e)(1) (also referred to herein as the "FLSA Plaintiffs") bring Count II (for FLSA violations) as a "opt in" collective action pursuant to 29 U.S.C. § 216(b), on behalf of themselves and on behalf of the following class of persons (hereinafter, the "FLSA Class"):

> All individuals in the State of Florida who have signed a contract with Defendants purportedly working as an independent contractor in Mears's Luxury Fleet Division during the last three (3) years, who were not paid a minimum wage, or at their regular rate of pay, for time worked on or off-the-clock, and/or at one and one- half times the regular rate of pay for all work performed in excess of forty (40) hours per work week.

108.    The FLSA Plaintiffs also seek any subclass, as may be hereinafter determined as necessary, based on material differences, if any, between the types of vehicles driven by Luxury Chauffeurs and any corresponding limitations on rights under the FLSA.

109.    The FLSA claims may be pursued by those who opt in to this case, pursuant to 29 U.S.C. § 216(b). The number and identity of other plaintiffs yet to opt in and consent to be party plaintiffs may be determined from Defendants' records. These putative class members may easily and quickly be notified of the pendency of this action.

110.    While the exact number of potential opt in plaintiffs is unknown to the FLSA Plaintiffs at the present, based on information and belief, there are potentially 300-500 such members. Thus, a collective action is the most efficient mechanism for resolution of the claims. To the extent required by law, notice will be provided to the prospective collective

action members via First Class Mail and/or by use of techniques in a form of notice that has been used customarily in collective actions, subject to court approval.

111. A claim for relief for violations under the FLSA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b) because the FLSA Plaintiffs' claims are similarly situated to the FLSA claims of the putative members of this collective action. They have substantially similar job requirements, pay provisions, and are subject to the same or similar contract.

112. The FLSA Plaintiffs seek relief on a collective basis challenging Defendants' policies and/or practices of knowingly: (1) misclassifying members of the putative FLSA Class as independent contractors; and (2) denying members of the putative FLSA Class at least minimum wage or their regular pay rate and/or overtime wages for all hours worked during their initial training and as Luxury Chauffeur, which were and are misclassified as independent contractors. Indeed, the FLSA Plaintiffs and members of the FLSA Class were, and are, subject to common practices, policies, procedures, edicts and/or plans—all of which required or permitted the FLSA Plaintiffs and members of the FLSA Class to perform undercompensated or uncompensated work for the benefit of Defendants—including, but not limited to:

      a. Defendants knowingly and systematically classified the FLSA Plaintiffs and members of the FLSA Class as independent contractors by controlling the manner and means of their performance through uniform practices, policies, and procedures;

b.　Defendants knowingly and systematically required the FLSA Plaintiffs and members of the FLSA Class to attend mandatory training without compensation;

c.　Defendants knowingly and systemically failed and refused to compensate the FLSA Plaintiffs and members of the FLSA Class who were and are required to complete and perform pre-shift and post-shift activities on Defendants' premises;

d.　Defendants knowingly and systematically failing and refusing to compensate the FLSA Plaintiffs and members of the FLSA Class for all hours they worked as a Luxury Chauffeur;

e.　Defendants knowingly and systematically failed and refused to compensate the FLSA Plaintiffs and members of the FLSA Class for the minimum wage for all hours that they worked as a Luxury Chauffeur; and

f.　Defendants knowingly and systematically failed and refused to compensate the FLSA Plaintiffs and members of the FLSA Class for overtime wages for all overtime hours that they worked as a Luxury Chauffeur.

113.　The FLSA Plaintiffs' and the FLSA Class members' performance of the tasks listed in the above paragraphs constitutes an integral and indispensable part of the principal activities for which they are or were employed and is therefore itself a principal activity and compensable under the FLSA.

114.　The FLSA Plaintiffs and members of the FLSA Class do not receive credit for, and/or are not fully and properly compensated for, any of the work described in the

above paragraphs, which is performed for Defendants' benefit. Defendants do not properly record, report, or maintain records of such unpaid or underpaid work performed by the FLSA Plaintiffs and members of the FLSA Class.

115. Defendants' policies, practices, procedures, and contracts underlying the allegations contained herein are applied (and continue to apply) uniformly, across all of Defendants' Luxury Vehicle operations. The FLSA Plaintiffs and members of the FLSA Class will fairly and adequately represent and protect the interests of the members of the collective action. The FLSA Plaintiffs have retained counsel competent and experienced in FLSA and employment law litigation.

## VI. CLASS ACTION ALLEGATIONS

116. Plaintiffs, individually and on behalf of the proposed classes as defined herein, re-allege and incorporate by reference all of the above paragraphs as if fully set forth herein.

117. Plaintiffs bring Counts I and III through VI (for injunctive and/or declaratory relief and violations of Florida state and common law) as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and the following class of persons (hereinafter, the "Common Law Classes"):

> All individuals in the State of Florida who attended Defendants' training and purportedly worked as an independent contractor in Mears's Luxury Fleet Division during the last four (4) years who have had to pay vehicle leases and associated work expenses and not been compensated either at their regular rate of pay for time worked on or off-the-clock, or at one and one- half times the regular rate of pay for all work performed in excess of forty (40) hours per work week.

118.    There do not appear to be any difficulties in managing this class action and the identity of members of the Common Law Classes is easily ascertainable from Defendants' records.

119.    **Numerosity:** The members of the classes are so numerous that joinder of all members would be impractical, if not impossible. Plaintiffs are informed and believe that there are hundreds of class members in Florida.

120.    **Commonality:** There are numerous questions of law and fact common to the Plaintiffs and members of the state law classes that they seek to represent. These questions include, but are not limited to, the following:

a.      Whether Plaintiffs and members of the Common Law Classes were misclassified as independent contractors;

b.      Whether Defendants' policies and practices described in this Complaint were, and are, in violation of state law, including their practice of charging Plaintiffs and members of the Common Law Classes for Defendants' ordinary business expenses;

c.      Whether Defendants were unjustly enriched;

d.      Whether Defendants made material misrepresentations of fact and law in their mandatory training class or in policies and contracts; and

e.      Whether Defendants have engaged in a common course of failing to compensate Class members for all hours worked and charging erroneously ordinary business expenses that should be borne by Defendants.

121.    **Typicality**: The claims of named Plaintiffs, as Class Representatives, are typical of the claims of all members of the respective state law classes which they seek to represent. Similarly, the Class Representatives' claims, like the claims of their respective classes, arise out of the same common course of conduct by Defendants and are based on the same legal and remedial theories, including, but not limited to:

a.    Whether Plaintiffs and members of the Common Law Classes were misclassified as independent contractors;

b.    Whether Defendants' policies and practices described in this Complaint were, and are, in violation of state law, including their practice of charging Plaintiffs and members of the Common Law Classes for Defendants' ordinary business expenses;

c.    Whether Defendants were unjustly enriched;

d.    Whether Defendants made material misrepresentations of fact and law in their mandatory training class; and

e.    Whether Defendants have engaged in a common course of failing to compensate Class members for all hours worked and charging erroneously ordinary business expenses that should be borne by Defendants.

122.    **Adequacy of Representation**: The Class Representatives will fairly and adequately protect the interests of their respective classes. The Class Representatives have retained competent and capable attorneys who are experienced trial lawyers with significant experience in complex and class action litigation, including employment litigation. The Class Representatives and their counsel are committed to prosecuting this action vigorously on

behalf of the Common Law Classes. Neither the Class Representatives nor their counsel has interests that are contrary to or that conflict with those of the proposed Common Law Classes.

123. Class certification of the Common Law Classes for Counts III through V is appropriate under Federal Rule 23(b)(3) because questions of law and fact common to class members predominate over any questions affecting only individual members. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

124. Class certification of the Common Law Classes for Counts III through V is appropriate under Federal Rule 23(b)(3) because class action mechanism is superior to any alternatives that might exist for the fair and efficient adjudication of these claims. Proceeding as a class action would permit the large number of injured parties to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort, and judicial resources. A class action is the only practical way to avoid the potentially inconsistent results that numerous individual trials are likely to generate. Moreover, class treatment is the only realistic means by which Plaintiffs can effectively litigate against large, well-represented entities like Defendants. In the absence of a class action, Defendants would be unjustly enriched because they would be able to retain the benefits and fruits of the many wrongful violations of numerous states' laws. Numerous repetitive individual actions would also place an enormous burden on the courts as they are forced to take duplicative evidence and decide the same issues relating to Defendants' conduct over and over again.

125. Counts III through V, if certified under Federal Rule 23(b)(3) for class-wide treatment, may be pursued by all similarly situated persons who do not opt out of the foregoing Common Law Classes.

126. Class certification of the Common Law Classes for Counts I and VI is appropriate under Federal Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Common Law Classes as a whole.

127. This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members.

128. This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I – DECLARATORY RELIEF
### (Class Action Under Federal Rule 23)

129. Plaintiffs, individually and on behalf of the proposed classes as defined herein, re-allege and incorporate by reference all of the above paragraphs as if fully set forth herein.

130. An actual and substantial controversy exists between members of the Common Law Classes (which include Plaintiffs) and Defendants over whether Plaintiffs are

Defendants' employees and whether the independent contractor agreement is void ab initio or voidable because:

      a.      language barriers existed;

      b.      there was a lack of capacity to understand the legal document without the ability to refer to a lawyer;

      c.      material bilateral mistakes existed with respect to whether Luxury Chauffeurs are independent contractors;

      d.      the contract is against prevailing public policies;

      e.      the contract is severely one-sided;

      f.      the contract restricts certain rights or actions such as the right to work;

      g.      Luxury Chauffeurs were coerced into signing the agreement;

      h.      Luxury Chauffeurs were under Mears's undue influence; and/or

      i.      Mears made a misrepresentation about a material fact.

131.    This case is justiciable because Defendants have failed to comply with their obligations under the FLSA and the voiding of the contract is a prerequisite to enforcing rights under the FLSA.

132.    Declaratory relief will clarify the rights and obligations of the parties and is, therefore, appropriate to resolve this controversy.

WHEREFORE, Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT II – VIOLATIONS OF THE FLSA –
## FAILURE TO PAY WAGES
### (Collective Action Under 29 U.S.C. § 216(b))

133. Plaintiffs, individually and on behalf of the proposed classes as defined herein, re-allege and incorporate by reference all of the above paragraphs as if fully set forth herein.

134. The FLSA Plaintiffs and members of the FLSA Class bring this action against Defendants because Defendants have willfully engaged in a pattern and practice of unlawful conduct by declining to record and pay for all of the time they require their misclassified Luxury Chauffeurs to work in violation of the FLSA. Defendants' unlawful conduct has been repeated and is consistent.

135. The FLSA Plaintiffs have been, and are, entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. §§ 201 *et seq*. Defendants are subject to the requirements of the FLSA because it is an enterprise engaged in interstate commerce and its employees are engaged in commerce. *See generally id.*

136. The FLSA requires the payment of minimum wage of no less than $7.25 per hour by employers whose employees are engaged in interstate commerce. 29 U.S.C. § 207(a)(1). The FLSA nevertheless permits states to set a minimum wage higher than that provided for by the FLSA. 29 U.S.C. § 218(a). Florida requires the payment of minimum wage of no less than $8.10 per hour by employers whose employees are entitled to receive the federal minimum wage under the FLSA. *See* Florida Minimum Wage Act § 448.110(3),

(4).[30] When a state law provides for a higher minimum wage than that set forth in the FLSA, the state provision controls. Moreover, under the FLSA, an employee is entitled to recover his or her regular rate of pay, which can be established by the facts or circumstances of the employment. Here, the FLSA Plaintiffs and the FLSA class would receive a rate of pay commensurate with Mears's Shuttle Van and Motor Coach drivers.

137.    The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1).

138.    The FLSA defines "employ" to include to suffer or permit to work. 29 U.S.C. § 203(g).

139.    The FLSA Plaintiffs and members of the FLSA Class are, or were, employed by Defendants during the time that they participated in the mandatory training sessions and, as such, are or were employees of Defendants. 29 U.S.C. § 203(e)(1), (g).

140.    The FLSA Plaintiffs and members of the FLSA Class are, or were, employed by Defendants during the time that worked as Luxury Chauffeurs and, as such, are or were employees of Defendants. 29 U.S.C. § 203(e)(1), (g).

141.    As a pattern and practice, Defendants regularly required the FLSA Plaintiffs and members of the FLSA Class to attend a mandatory initial two- to three-day training sessions without the payment of any wages. Defendants were aware of such non-payment of wages.

---

[30] *See also* http://www.floridajobs.org/docs/default-source/2017-minimum-wage/florida-minimum-wage-2017-announcement.pdf?sfvrsn=2%20Florida.

142.    As a pattern and practice, Defendants regularly failed to pay the FLSA Plaintiffs and members of the FLSA Class minimum wage or a regular rate as compensation for hours worked during the initial training session and during their employment purportedly as independent contractors.

143.    Defendants have violated, and continue to violate the FLSA, including 29 U.S.C. § 206(a)(1), by failing to pay wages for training time and wages for subsequent work as a Luxury Chauffeur in that Defendants failed to compensate the FLSA Plaintiffs and members of the FLSA Class at a regular rate of pay, which should be not less than $8.10 per hour.

144.    Defendants' intentional and continuing practice of failing to pay Plaintiffs and the FLSA Class overtime at a rate not less than one and one-half times their regular rate for all hours worked over forty violates the FLSA. *See* 29 U.S.C. § 207.

145.    The FLSA exempts certain categories of employees from overtime pay obligations, but none of the FLSA exemptions apply to Plaintiffs and the FLSA Class. *See* 29 U.S.C. § 213.

146.    Defendants knew or should have known that they permit or require the FLSA Plaintiffs and members of the FLSA Class to perform work which is for the benefit of Defendants and is integral to their operations, without appropriate compensation, including time spent completing tasks before and after scheduled shifts, uncompensated work time and undercompensated work time. The conduct of Defendants, as set forth above herein, has been willful, in bad faith, and has caused significant damages to the FLSA Plaintiffs and members of the FLSA Class.

147.     The FLSA Plaintiffs and members of the FLSA Class are entitled to damages at least equal to the mandated minimum wage and any overtime pay for each hour of training time and all other hours worked as a Luxury Chauffeur within the three years preceding the filing of this Complaint, plus periods of equitable tolling, because Defendants acted willfully and knew, or showed reckless disregard of whether, its conduct was prohibited by the FLSA.

148.     Defendants have acted neither in good faith nor with reasonable grounds to believe that their actions and omissions were not a violation of the FLSA, and as a result thereof, the FLSA Plaintiffs and members of the FLSA Class are entitled to recover an award of liquidated damages in an amount at least equal to the amount of unpaid minimum wages and overtime pay pursuant to 29 U.S.C. § 216(b).

149.     Alternatively, should the Court find that Defendants did act with good faith and reasonable grounds in failing to pay at least minimum wages and overtime, the FLSA Plaintiffs and members of the FLSA Class are entitled to an award of pre-judgment interest at the applicable legal rate.

150.     As a result of the aforesaid willful violations of the FLSA's minimum wage and overtime provisions, compensation and employee benefits/employer contributions have been unlawfully withheld by Defendants from the FLSA Plaintiffs and members of the FLSA Class. Plaintiffs and the FLSA Class therefore seek at least unpaid minimum wages, or a regular rate of pay as established by the facts and circumstances, together with overtime compensation in an amount to be determined, as well as an equal amount of liquidated damages, pre-judgment and post-judgment interest, costs, and attorneys' fees pursuant to 29 U.S.C. § 216(b). Plaintiffs and the FLSA Class further seek to recover the amount equal to

the employee benefits/employer contributions to which they would have been entitled had they been properly classified as nonexempt employees, and such other legal and equitable relief as the Court deems just and proper.

WHEREFORE, Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT III – FRAUD IN THE INDUCEMENT
### (Class Action Under Federal Rule 23)

151.    Plaintiffs, individually and on behalf of the proposed classes as defined herein, re-allege and incorporate by reference all of the above paragraphs as if fully set forth herein.

152.    Defendants misrepresented a material fact when they represented to Luxury Chauffeurs, like Plaintiffs and members of the Common Law Classes, that they should be classified as independent contractors rather than non-exempt employees. Defendants made these material misrepresentations pursuant to scripted presentations at their mandatory initial training, in their uniform independent contractor agreements and in connection with their uniform policies and procedures.

153.    Upon information and believe, Defendants knew or should have known about the falsities of their classification based on their refusal to allow anybody to have a copy of their independent contractor agreement, and how they phrase antagonistic facts like, for example, training as familiarization. Moreover, Defendants knew or should have known about the falsities of their classification based on the facts and circumstances involving (a) *City Cab Co. of Orlando, Inc. v. N. L. R. B.*, 628 F.2d 261 (1980) (holding that Mears

drivers, who had a relationship with Mears similar to that of Luxury Chauffeurs, were employees rather than independent contractors); (b) an adverse determination dated May 2, 2005, by Florida's Agency for Workforce Innovation c/o Department of Revenue holding that Mears misclassified its Luxury Chauffeurs as contractors; (c) a 2008 NLRB investigation that led to a complaint filed by the Florida Civil Rights Association (FCRA) seeking the reclassification of independent contractors to employees (NLRB case number 12-CA-025875); (d) recent modification to its contractor model to continue the appearance and misrepresentation of independence; (e) written policies suggesting Luxury Chauffeurs have options when such policies are contradicted by, and thus illusory based on, the facts; and (f) the advice of counsel relied upon in creating, restructuring or otherwise altering Mears's independent contractor model.

154.    Defendants intended that their misrepresentations about the benefits of being an independent contractor and the classification of the Luxury Chauffeurs as contractors would induce Luxury Chauffeurs to rely and act on the misrepresentations.

155.    Plaintiffs and members of the Common Law Classes justifiably relied on Defendants' misrepresentations resulting in injury to Plaintiffs and members of the Common Law Classes.

WHEREFORE, Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT IV – UNJUST ENRICHMENT
### (Class Action Under Federal Rule 23)

156.    Plaintiffs, individually and on behalf of the proposed classes as defined herein, re-allege and incorporate by reference all of the above paragraphs as if fully set forth herein.

157.    At all times material, Plaintiffs and members of the Common Law Classes conferred benefits upon Defendants in terms of: (a) services and/or labor performed by Plaintiffs and members of the Common Law Classes, (b) payment of Defendants' ordinary business expenses by Plaintiffs and members of the Common Law Classes, and/or (c) receipt of the funds from clients or customers earned by or belonging to Plaintiffs and members of the Common Law Classes.

158.    At all times material, Defendants either requested the conferred benefits or knowingly and voluntarily accepted them.

159.    Under the circumstances, it would be inequitable for Defendants to retain the benefit of the services or funds without paying value thereof.

160.    Moreover, because the independent contractor agreements are null and unenforceable as a matter of law, Plaintiffs, and members of the Common Law Classes, lack an adequate remedy at law.

161.    Plaintiffs and members of the Common Law Classes have been damaged.

WHEREFORE, Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT V – QUANTUM MERUIT
### (Class Action Under Rule 23)

162.    Plaintiffs, individually and on behalf of the proposed classes as defined herein, re-allege and incorporate by reference all of the above paragraphs as if fully set forth herein.

163.    At all times material, Plaintiffs and members of the Common Law Classes conferred benefits upon Defendants in terms of services and/or labor performed by Plaintiffs and members of the Common Law Classes.

164.    At all times material, Defendants assented to and received those services.

165.    Defendants were aware that Plaintiffs and members of the Common Law Classes expected to be compensated for their services and/or labor.

166.    Defendants were unjustly enriched thereby.

167.    Plaintiffs and members of the Common Law Classes are entitled to the reasonable value of the labor performed.

WHEREFORE, Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT VI – INJUNCTIVE RELIEF
### (Class Action Under Federal Rule 23)

168.    Plaintiffs, individually and on behalf of the proposed classes as defined herein, re-allege and incorporate by reference all of the above paragraphs as if fully set forth herein.

169.    Plaintiffs Victor Rodriguez, Efrain Oviedo, Marilyn Ortiz, and Domingo Gomez, along with members of the FLSA Class who are still working for Mears ("Injunctive

Plaintiffs") have been injured by Defendants' failure to comply with the FLSA. Injunctive Plaintiffs will be irreparably harmed if an injunction does not issue enjoining Defendants from continuing to evade their duties under the FLSA.

170.    Injunctive Plaintiffs have no other plain, speedy, or adequate remedy at law to ensure Defendants prospectively follow the FLSA.

171.    Injunctive Plaintiffs' claims for relief are ripe.

172.    If not enjoined by this Court, Injunctive Plaintiffs allege on information and belief that Defendants will continue to violate the law.

173.    Accordingly, injunctive relief is appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the respective classes, pray judgment against Defendants as follows:

1.    Certifying the classes as requested herein;

2.    Entering an order appointing Lawrence & Bundy, LLC as lead counsel for the classes;

3.    Awarding compensatory damages pursuant to 29 U.S.C. § 216(b) and actual damages under state law, which together significantly exceed the aggregate sum of $5,000,000.00 paid by each Defendant to Plaintiffs and the members of the classes;

4.    Awarding an additional amount as liquidated damages;

5.    Awarding punitive damages against each Defendant as the Court deems necessary or proper;

6. Awarding declaratory and injunctive relief as permitted by law or equity including a permanent injunction enjoining Defendants from continuing the unlawful practices as set forth herein, and a declaratory judgment finding that Mears's contractor agreement is void ab initio or voidable;

7. Awarding pre-judgment and post-judgment interest;

8. For reasonable attorneys' fees and costs herein; and

9. Awarding such other and further relief as the court deems fit and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

On this 19th day of June, 2017.            Respectfully submitted,

/s/ Thomas R. Bundy, III
Thomas R. Bundy III**
Trial Counsel
Lawrence & Bundy LLC
8115 Maple Lawn Blvd., Suite 350
Fulton, Maryland 20759
240-786-4512 (main)
240-786-4998 (direct)
240-786-4501 (fax)
thomas.bundy@lawrencebundy.com

Leslie J. Bryan
Florida Bar No. 95535*
Lisa M. Haldar**
Lawrence & Bundy LLC
1180 West Peachtree Street, N.W.
Suite 1650
Atlanta, Georgia 30309
(404) 400-3350
leslie.bryan@lawrencebundy.com
lisa.haldar@lawrencebundy.com
*M.D. Fla. general admission pending

*\*\*Pro hac application forthcoming*

/s/ Carlos J. Burruezo
Carlos J. Burruezo
Florida Bar No. 843458
Bertha L. Burruezo
Florida Bar No. 596973
Burruezo & Burruezo, PLLC
941 Lake Baldwin Lane
Suite 102
Orlando (Baldwin Park), Florida 32814
(407) 754-2904
carlos@burruezolaw.com
bertha@burruezolaw.com

**Attorneys for Plaintiffs**